UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JUL 19 2010

Clerk, U.S. District & Bankruptcy Courts for the District of Columbia

| | |
|---|---|
| DAN ABRAHAM SARFATI, 531 Leslie Drive, Hallandale, Florida 33009, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>ANTIGUA AND BARBUDA, a foreign state, (New Government Office Complex, Queen Elizabeth Highway, St. John's, Antigua), the MINISTRY OF FINANCE, a political subdivision of Antigua and Barbuda, (New Government Office Complex, Parliament Drive, St. John's, Antigua), and the MINISTRY OF AGRICULTURE, FISHERIES, LANDS, AND HOUSING, a political subdivision of Antigua and Barbuda, (Independence Drive and Queen Elizabeth Highway, St. John's, Antigua),<br><br>Defendants. | Civil Action No.:<br><br>Case: 1:10-cv-01221<br>Assigned To : Walton, Reggie B<br>Assign. Date : 7/19/2010<br>Description: Contract |

## VERIFIED COMPLAINT

Plaintiff, Dan Abraham Sarfati ("Plaintiff"), sues Defendants, Antigua and Barbuda ("Antigua"); the Antiguan Ministry of Finance; and the Antiguan Ministry of Agriculture, Fisheries, Lands, and Housing ("Ministry of Agriculture") (collectively referred to as "Defendants"); and alleges as follows:

### NATURE OF THE ACTION

1. This is an action for damages resulting from Defendants' breaches of three promissory notes and a related guarantee. Plaintiff asserts his claims as an assignee of Roydan, Ltd. ("Roydan"). In 1987, Roydan agreed to provide the Ministry of Agriculture with the funding and equipment necessary to rehabilitate fallow land into fertile farmland in Antigua. In exchange, the Ministry of Agriculture, on behalf of Antigua, executed and delivered to Roydan

-2-

four promissory notes for the total sum of US$1,000,000.00 plus interest. The Ministry of Finance guaranteed the payment of the four promissory notes, one of which was later sold to another investor.

2. Despite Roydan's full performance of its contractual obligations, Defendants never made any payments on any of the promissory notes. Instead, from about 1990 until recently, Defendants used threats and other misconduct to prevent Plaintiff from pursuing legal remedies to recover the monies owed under the promissory notes.

## JURISDICTION AND VENUE

3. This Court has jurisdiction under 28 U.S.C. §§ 1330(a), 1330(b), and 1605(a).

4. Venue is proper in this district under 28 U.S.C. § 1391(f)(4).

## PARTIES

5. Plaintiff is a citizen of the United States of America residing in the state of Florida. He was born in 1982 and reached the age of majority in 2000.

6. Defendant, Antigua, is a foreign state. At all relevant times, Antigua engaged in regular, sustained, and substantial commercial and business activity in the United States of America. Antigua may not claim sovereign immunity from this suit because, among other things: (1) it has waived its immunity under 28 U.S.C. § 1605(a)(1); and (2) its conduct arises from commercial activity that "causes a direct effect in the United States" under 28 U.S.C § 1605(a)(2) in the form of failing to pay the monies owed to Plaintiff in New York, New York, as required under the promissory notes.

7. Defendant, the Ministry of Agriculture, is a political subdivision of Antigua. At all relevant times, the Ministry of Agriculture engaged in regular, sustained, and substantial commercial and business activity in the United States of America. The Ministry of Agriculture may not claim sovereign immunity from this suit because, among other things: (1) it has waived

its immunity under 28 U.S.C. § 1605(a)(1); and (2) its conduct arises from commercial activity that "causes a direct effect in the United States" under 28 U.S.C § 1605(a)(2) in the form of failing to pay the monies owed to Plaintiff in New York, New York, as required under the promissory notes.

8.    Defendant, the Ministry of Finance, is a political subdivision of Antigua. At all relevant times, the Ministry of Finance engaged in regular, sustained, and substantial commercial and business activity in the United States of America. The Ministry of Finance may not claim sovereign immunity from this suit because, among other things: (1) it has waived its immunity under 28 U.S.C. § 1605(a)(1); and (2) its conduct arises from commercial activity that "causes a direct effect in the United States" under 28 U.S.C § 1605(a)(2) in the form of failing to pay the monies owed to Plaintiff in New York, New York, as required under the promissory notes.

9.    At all relevant times, each Defendant was the agent of each of the remaining Defendants and were at all times mentioned herein acting within the scope, course, and purpose of said agency.

10.   At all relevant times, each Defendant voluntarily, completely, and with full knowledge of the material facts, ratified, affirmed, and accepted the benefits of each act and omission by every other Defendant, thereby rendering valid and binding upon that Defendant the full consequence and responsibility for each act or omission of the other Defendants.

## RELEVANT NON-PARTIES

11.   Maurice Sarfati ("Maurice") is an international businessman and Plaintiff's father.

12.   At all relevant times, Roydan was a lawful corporation organized and existing under the laws of Antigua. Its purpose was, among other things, to engage in agricultural

business. Its principal was Maurice and its sole shareholders were Maurice's sons, Roy Sarfati and Plaintiff.

13.  Vere Cornwall Bird, Sr. ("Vere Bird, Sr.") was Antigua's first Prime Minister from about 1981 to 1994. At all relevant times, Vere Bird, Sr. was an official of the government of Antigua and acted within his official capacity on behalf of Antigua. At all relevant times, Vere Bird, Sr. was an agent, servant, and employee of Antigua and acted within the scope, course, and purpose of said agency and employment.

14.  Vere Bird, Jr. ("Vere Bird, Jr.") is the son of Vere Bird, Sr. He was also, among other things, Antigua's Minister of Public Utilities from 1984 to 1991. At all relevant times, Vere Bird, Jr. was an official of the government of Antigua and acted within his official capacity on behalf of Antigua. At all relevant times, Vere Bird, Jr. was an agent, servant, and employee of Antigua and acted within the scope, course, and purpose of said agency and employment.

15.  Lester Bryant Bird ("Lester Bird") is also the son of Vere Bird, Sr. He was also, among other things, Antigua's Minister of Foreign Affairs from about 1981 until 1994, and Antigua's second Prime Minister and Minister of Finance from about 1994 to 2004. At all relevant times, Lester Bird was an official of the government of Antigua and acted within his official capacity on behalf of Antigua. At all relevant times, Lester Bird was an agent, servant, and employee of Antigua and acted within the scope, course, and purpose of said agency and employment.

16.  At all relevant times, Jeff Harley was, among other things, the direct personal assistant to Lester Bird. At all relevant times, Jeff Harley was an agent, servant, and employee of Antigua, and acted within the scope, course, and purpose of said agency and employment.

17. At all relevant times, the executive branch of the Antiguan government that governed Antigua from about 1981 to 2004 (the "Bird Administration") was directed, dominated, and controlled by Vere Bird, Sr. and Lester Bird. At all relevant times, the Bird Administration was a branch of the Antiguan government and acted on behalf of Antigua.

## GENERAL ALLEGATIONS

### *The Government of Antigua*

18. Antigua is a two-island nation located in the heart of the Caribbean. It is a constitutional monarchy with a British-style parliamentary system of government. Its current head of government is Prime Minister Baldwin Spencer, who was elected as Antigua's third Prime Minister in about March 2004.

19. However, from as early as 1981 until recently, the government of Antigua has been directed, dominated, and controlled by the Bird Administration, which was notorious for its corruption. It has been condemned by, among others, the United States government and Antigua's current government. According to Prime Minister Baldwin Spencer's Action Agenda posted on the official website of the Government of Antigua in 2004, it was well known that "senior officials in the Bird government were significant players in the international syndicate of major drug cartels" and that "[e]ndemic corruption, extortion and theft contaminated every area, every level of [the Bird] government up to Judgment Day." The Bird Administration was also notorious for being "grossly delinquent in its financial obligations to just about every international organization in which [Antigua] was a participant." It was also "just as delinquent with the government's local creditors." According to a report released by the Bureau of Democracy, Human Rights, and Labor and published by the United States Department of State in

2006, "[h]igh-level corruption was a problem [in Antigua], particularly during the former ALP [Bird] Administration."

20.     Among other things, the Bird Administration was notorious for extorting money, property, and services from unsuspecting foreign investors through threats, coercion, and other misconduct. Its modus operandi was simple but effective.

21.     Upon information and belief, the Bird Administration would lure unsuspecting foreign investors into Antigua with the prospect of good returns. It would then direct the foreign investors to open bank accounts at the Swiss American National Bank of Antigua ("SANBA"), where the Bird Administration could closely monitor their activities and finances. At all relevant times, SANBA was owned by individuals well-connected to the Bird Administration and complicit in some of the Bird Administration's illicit activities.

22.     Upon information and belief, the Bird Administration would also direct the foreign investors to retain the services of Bird & Bird, an Antiguan law firm, to manage all of their legal affairs. At all relevant times, the law firm of Bird & Bird was owned by, among others, Vere Bird, Jr. and Lester Bird.

23.     Upon information and belief, once the Bird Administration was in a position to monitor the foreign investors' finances and legal affairs, it would then make illegitimate demands for money, property, and services. Those foreign investors that refused the Bird Administration's demands would face, among other things, threats of incarceration, personal ruin, and the loss of their investments and businesses. One such foreign investor was Plaintiff's father, Maurice.

### *An Unsuspecting Foreign Investor*

24.     In early 1984, then Prime Minister Vere Bird, Sr. and then Minister of Public Utilities Vere Bird, Jr. invited Maurice to invest in and develop an agricultural project in Antigua (the "Agricultural Project"). Unaware at that time of the Bird Administration's rampant corruption, Maurice accepted the invitation.

25.     In 1985, Maurice moved to Antigua and established Roydan, an Antiguan corporation. During the following years, Maurice would use Roydan to carry out the Agricultural Project.

26.     Around the same time, Maurice opened personal accounts and corporate accounts in Roydan's name at SANBA. He also retained the law firm of Bird & Bird to handle all of his personal and Roydan's corporate legal affairs in Antigua. Maurice took all of these actions based on the Bird Administration's advice and recommendations.

27.     Under Maurice's guidance and leadership, the Agricultural Project was a success. Not only did Antigua's local economy benefit from the increase in exports and the influx of hard currency, but the Antiguan people also benefited from the jobs the Agricultural Project created and the introduction of new agricultural technologies.

28.     Accordingly, in 1987, the then Minister of Agriculture Hilroy Humphreys contacted Maurice about assisting in another project for Antigua. The goal of the project was to use, among other things, modern agriculture equipment to rehabilitate up to 5,000 acres of fallow land into fertile farmland (the "Rehabilitation Project"). However, when the Ministry of Agriculture could not secure the necessary funding, equipment, or expertise for the Rehabilitation Project, it turned to Maurice and his company, Roydan, for assistance.

*The Transaction At Issue*

29. On or about June 16, 1987, Roydan entered into an agreement with the Ministry of Finance, whereby Roydan agreed to provide the Ministry of Agriculture with the line of credit, equipment, material and services necessary for the Rehabilitation Project. In exchange, the Ministry of Finance agreed to "guarantee[ ] payment to ROYDAN LTD of all debts and liabilities unpaid by the MINISTRY OF AGRICULTURE to ROYDAN LTD" (the "Guarantee"). *See* Exhibit A.

30. On or about June 19, 1987, Roydan entered into an agreement with the Ministry of Agriculture, whereby Roydan agreed to provide the Ministry of Agriculture with the line of credit, equipment, material and services necessary for the Rehabilitation Project. In exchange, the Ministry of Agriculture executed and delivered to Roydan a series of four Promissory Notes each in the principal sum of US$250,000.00. Promissory Note No. 3 was later sold to another investor. Promissory Note No. 1, Promissory Note No. 2, and Promissory Note No. 4 (collectively referred to as the "Notes") remain outstanding and unpaid. Copies of the Notes are attached hereto as composite Exhibit B.

31. Shortly thereafter, Roydan fully performed its contractual obligations under the Notes and the Guarantee by providing the Ministry of Agriculture with, among other things, the line of credit, equipment, material and services necessary for the Rehabilitation Project.

32. On or about October 15, 1987, Roydan assigned "all of its right, title, and interest" in the Notes to Plaintiff. *See* Exhibit C.

### *Relevant Terms of the Promissory Notes*

33. The terms of each of the Notes are identical, except for the due dates. Each provides in pertinent part that:

> [T]he Ministry of Agriculture . . . on behalf of the government of Antigua and Barbuda an institution organized and existing under

> the laws of Antigua and Barbuda, (maker) hereby unconditionally promises to pay, against this note to the order of Roydan Ltd, . . . the principal sum of USD 250.000.–.
>
> For each one year period during which this note is outstanding interest on the principal amount of this note shall be fixed with respect to each such one year period at a rate of six (6) per cent [sic] per annum compounded . . . .
>
> In the event that the principal or and [sic] interest amount of this note is not paid in full when due, such unpaid principal amount shall carry interest from due date thereof up to the date of payment [sic] is received by the holder hereof (after as well as before judgment) at a rate of 10 per cent [sic] per annum computed on the basis of a year of 360 days and for the actual number of days elapsed.

*See* composite Exhibit B (capitalization omitted).

      34.    Payment under Promissory Note No. 1 was due on June 2, 1990; payment under Promissory Note No. 2 was due on June 10, 1990; and payment under Promissory Note No. 4 was due on June 30, 1990. *See id.*

      35.    All payments under the Notes were required to be made "at the main office of Chemical Bank, New York, N.Y., U.S.A." *See id.* (capitalization omitted).

      36.    To date, Promissory Note No. 1, Promissory Note No. 2, and Promissory Note No. 4 remain outstanding and unpaid.

      37.    The Notes also provide that they "shall be governed and construed in accordance with the laws of the State of New York, U.S.A." *See id.* (capitalization omitted).

### *Defendants' Threats, Coercion, and Other Misconduct*

      38.    In 1987, Maurice arranged for Plaintiff to discount and sell Promissory Note No. 3 to the firm of Drexel Burnham Lambert, Inc. in Puerto Rico.

      39.    Almost immediately thereafter, Maurice's relations with the Bird Administration began to deteriorate.

40.  In late 1987, Maurice received a visit in his office in Antigua from Jeff Harley, the direct personal assistant of Lester Bird who was then Antigua's Minister of Foreign Affairs. Jeff Harley was a well-known "enforcer" of the Bird Administration and almost always carried a gun. This visit was no exception.

41.  After ensuring that Maurice knew that he was armed, Jeff Harley demanded that Maurice give Lester Bird a twenty-five percent (25%) stake in Roydan's Agricultural Project. When Maurice refused, Jeff Harley became menacing and threatened Maurice. He warned Maurice that if he did not change his mind, the Bird Administration would, among other things, shut down the Agricultural Project.

42.  Shortly thereafter, the Bird Administration began to retaliate against Maurice for his refusal to comply with its demand. Among other things, the Bird Administration caused: the water and electrical supply to the Agricultural Project to be cut off; the Antiguan Power Company to raise the tariffs on the Agricultural Project; and imported materials for the Agricultural Project to be seized and held at customs, despite a duty free regime.

43.  Following these retaliatory actions, in early 1988, Maurice received another visit from Jeff Harley in his office in Antigua. Once again, Jeff Harley made it clear that he had a gun. He then asked Maurice whether he had changed his mind about the Bird Administration's demands. Maurice responded that he would never succumb to any illegitimate demands. Jeff Harley then warned Maurice that if he did not change his mind, the Bird Administration would, among other things, shut down the Agricultural Project.

44.  Later in 1988, Maurice received another unexpected visit from Jeff Harley at his home in Miami, Florida. Jeff Harley refused to leave until Maurice gave him money. Fearing the worst for himself and his family, Maurice called Vere Bird, Jr. for advice. Vere Bird, Jr.

advised Maurice that it was in his best interest to give Jeff Harley whatever he demanded. In an effort to protect his family and appease Jeff Harley, Maurice gave him approximately US$3,500.00 in cash.

45. Following these visits from Jeff Harley and having grown increasingly fearful of the Bird Administration, Maurice made numerous pleas to meet with the then Prime Minister, Vere Bird, Sr. However, the Prime Minister denied Maurice's pleas and the Bird Administration continued its retaliatory actions.

46. Around April 1988, Maurice received a phone call from a representative of SANBA. The representative told Maurice that his personal accounts and Roydan's corporate accounts had been frozen. The representative also demanded immediate satisfaction of Roydan's corporate line of credit. Upon information and belief, all of SANBA's actions were directed and controlled by the Bird Administration.

47. Later that same day, Lester Bird invited Maurice to his home. Lester Bird told Maurice that the Bird Administration was in the process of taking over the Agricultural Project. It was clear to Maurice that this action was in retaliation for his repeated refusals to comply with the Bird Administration's demands.

48. Around July 1988, the Bird Administration caused Roydan to be placed into receivership.

49. Around August 1988, the Bird Administration confiscated the Agricultural Project and transferred ownership of it to SANBA.

50. Shortly thereafter, Vere Bird, Jr. advised Maurice that he should leave Antigua immediately. Otherwise, he would not be able to leave. Recognizing that he was no match for the powerful and ruthless Bird Administration, Maurice heeded the advice.

51.   In late 1988, Maurice fled Antigua for Miami, Florida, never to return again.

52.   Throughout 1989 and 1990, while living in Miami, Maurice received many phone calls from Vere Bird, Jr.  During each phone call, Vere Bird, Jr. threatened Maurice that if he or Plaintiff ever made any attempt to collect payment on the Notes, the Bird Administration would issue an international arrest warrant for Maurice, have him extradited to Antigua, and incarcerate him.

53.   Maurice also received warnings from his new Antiguan attorney, Time Kendal. The Bird Administration had contacted Time Kendal and told him that if Maurice or Plaintiff ever sought payment on the Notes, the Bird Administration would issue an international arrest warrant for Maurice, have him extradited to Antigua, and incarcerate him.

54.   Maurice also received warnings from Micha Peretz, who was the manager retained to oversee the Agricultural Project after it was confiscated from Roydan.  Micha Peretz warned Maurice that Jeff Harley had been visiting Micha Peretz and making threats towards Maurice.  Among other things, Jeff Harley threatened that if Maurice or Plaintiff ever attempted to collect payment under the Notes, the Bird Administration would issue an international arrest warrant for Maurice, have him extradited to Antigua, and incarcerate him.

55.   Given the extent of the Bird Administration's power and corruption, the prohibitive effect of these threats persisted well beyond 2004.

56.   Indeed, although a new administration eventually took office after Prime Minister Baldwin Spencer won Antigua's general elections in March 2004, the threats against Maurice, Plaintiff, and their family remained very real.  Upon information and belief, former officials, agents, and employees of the Bird Administration including, but not limited to, Lester Bird and Vere Bird, Jr., remained well-connected with the international syndicate of drug cartels and

highly influential in the new administration. According to a report released by the Bureau of Democracy, Human Rights, and Labor on March 8, 2006 and published on the United States Department of State website, "high-level corruption" remained a problem in Antigua despite the change in administrations.

57. Accordingly, Plaintiff continued to fear the Antiguan government. Plaintiff feared that the new administration would continue the same corrupt practices and policies of the Bird Administration. Given his fear, Plaintiff did not immediately demand payment on the Notes from the new administration. Instead, Plaintiff decided to "wait and see."

58. After observing the new administration's governance of Antigua for over a year and a half, Plaintiff decided to cautiously approach the new administration about payment on the Notes. On November 22, 2005, Bill O'Connor, a U.S. attorney, sent a letter to Prime Minister Spencer Baldwin demanding payment on the Notes. Neither Prime Minister Baldwin Spencer, his administration, Defendants, nor anyone on their behalf ever responded. Defendants' silence, however, spoke volumes.

59. Around the same time, Mr. O'Connor told Maurice about a similar experience he had had with the Bird Administration. Upon information and belief, sometime in 1996, the Bird Administration threatened Mr. O'Connor that if he continued to pursue one of his client's lawsuits against Antigua, the Bird Administration would issue an international arrest warrant for his arrest, have him extradited to Antigua, and incarcerate him.

60. Given the new administration's decision to ignore the demand letter and its ongoing smear campaign of Maurice, as shown on its political party's website during the 2009 general elections in Antigua, Plaintiff continued to fear that any further attempts to seek payment of the Notes would lead to harm to his family.

61. At all relevant times, Maurice communicated the Bird Administration's threats, intimidations, extortions, and other misconduct to Plaintiff. At all relevant times, Plaintiff had knowledge and awareness of the Bird Administration's threats, intimidations, extortions, and other misconduct, and feared for his personal well-being and his family's safety.

62. At all relevant times, Plaintiff has feared demanding payment on the Notes because of, among other things, the Bird Administration's threats, intimidations, extortions, and other misconduct; its connections with the international syndicate of drug cartels; its influence over the new administration; and the reported "high-level corruption" that remained a problem in the new administration.

63. At all relevant times, the Defendants' threats and other misconduct wrongfully induced Plaintiff to refrain from timely commencing suit for breach of the Notes and the Guarantee.

64. At all relevant times, it was the Defendants' affirmative wrongdoing that produced the long delay between the accrual of Plaintiff's causes of action for breach of contract and the institution of this legal action.

65. By reason of the foregoing, Plaintiff is entitled to an equitable tolling of the applicable statute of limitations and Defendants are equitably estopped from asserting a statute of limitations defense.

66. All conditions precedent to the bringing of this action have been either performed, waived, or excused.

## COUNT I
### Breach of Promissory Note No. 1

67. Plaintiff realleges paragraphs 1 through 66 of his Complaint as if fully set forth herein.

-15-

68. At all relevant times, a valid contract in the form of Promissory Note No. 1 existed between Plaintiff, as assignee of Roydan, and the Ministry of Agriculture and Antigua.

69. On or about June 2, 1990, the Ministry of Agriculture and Antigua materially breached Promissory Note No. 1 by, among other things, failing to pay the principal sum of US$250,000.00 plus interest to Plaintiff in New York, New York.

70. As a result of the aforementioned breach, Plaintiff has suffered damages including, but not limited to, the monies due under Promissory Note No. 1, pre- and post-judgment interest, attorney's fees, and costs.

WHEREFORE, Plaintiff demands judgment against Defendants, the Ministry of Agriculture and Antigua, for: (1) the principal sum of US$250,000.00 plus interest, together with pre- and post-judgment interest accrued thereon, costs and expenses, including reasonable attorney's fees pursuant to the terms of Promissory Note No. 1; (2) all other amounts due and payable under Promissory Note No. 1; and (3) for such other and further relief the Court deems just and proper.

## COUNT II
### Breach of Promissory Note No. 2

71. Plaintiff realleges paragraphs 1 through 66 of his Complaint as if fully set forth herein.

72. At all relevant times, a valid contract in the form of Promissory Note No. 2 existed between Plaintiff, as assignee of Roydan, and the Ministry of Agriculture and Antigua.

73. On or about June 10, 1990, the Ministry of Agriculture and Antigua materially breached Promissory Note No. 2 by, among other things, failing to pay the principal sum of US$250,000.00 plus interest to Plaintiff in New York, New York.

74. As a result of the aforementioned breach, Plaintiff has suffered damages including, but not limited to, the monies due under Promissory Note No. 2, pre- and post-judgment interest, attorney's fees and costs.

WHEREFORE, Plaintiff demands judgment against Defendants, the Ministry of Agriculture and Antigua, for: (1) the principal sum of US$250,000.00 plus interest, together with pre- and post-judgment interest accrued thereon, costs and expenses, including reasonable attorney's fees pursuant to the terms of Promissory Note No. 2; (2) all other amounts due and payable under Promissory Note No. 2; and (3) for such other and further relief the Court deems just and proper.

## COUNT III
### Breach of Promissory Note No. 4

75. Plaintiff realleges paragraphs 1 through 66 of his Complaint as if fully set forth herein.

76. At all relevant times, a valid contract in the form of Promissory Note No. 4 existed between Plaintiff, as assignee of Roydan, and the Ministry of Agriculture and Antigua.

77. On or about June 30, 1990, the Ministry of Agriculture and Antigua materially breached Promissory Note No. 4 by, among other things, failing to pay the principal sum of US$250,000.00 plus interest to Plaintiff in New York, New York.

78. As a result of the aforementioned breach, Plaintiff has suffered damages including, but not limited to, the monies due under Promissory Note No. 4, pre- and post-judgment interest, attorney's fees and costs.

WHEREFORE, Plaintiff demands judgment against Defendants, the Ministry of Agriculture and Antigua, for: (1) the principal sum of US$250,000.00 plus interest, together with pre- and post-judgment interest accrued thereon, costs and expenses, including reasonable

attorney's fees pursuant to the terms of Promissory Note No. 4; (2) all other amounts due and payable under Promissory Note No. 4; and (3) for such other and further relief the Court deems just and proper.

## COUNT IV
## Breach of the Guarantee

79. Plaintiff realleges paragraphs 1 through 66 of his Complaint as if fully set forth herein.

80. At all relevant times, a valid contract in the form of the Guarantee existed between Plaintiff, as assignee of Roydan, and the Ministry of Finance and Antigua.

81. On or about June 2, 1990, the Ministry of Finance and Antigua materially breached the Guarantee by, among other things, failing to pay the principal sum of US$250,000.00 plus interest due under Promissory Note No. 1 to Plaintiff in New York, New York.

82. On or about June 10, 1990, the Ministry of Finance and Antigua materially breached the Guarantee by, among other things, failing to pay the principal sum of US$250,000.00 plus interest due under Promissory Note No. 2 to Plaintiff in New York, New York.

83. On or about June 30, 1990, the Ministry of Finance and Antigua materially breached the Guarantee by, among other things, failing to pay the principal sum of US$250,000.00 plus interest due under Promissory Note No. 4 to Plaintiff in New York, New York.

84. As a result of the aforementioned breaches, Plaintiff has suffered damages including, but not limited to, the monies due under Promissory Note No. 1, Promissory Note No. 2., and Promissory Note. No. 4, pre- and post-judgment interest, attorney's fees and costs.

-18-

WHEREFORE, Plaintiff demands judgment against Defendants, the Ministry of Finance and Antigua, for: (1) the amount of US$750,000.00 plus interest, together with pre- and post-judgment interest accrued thereon, costs, expenses, and attorney's fees; (2) all other amounts due and payable under the Guarantee; and (3) for such other and further relief the Court deems just and proper.

Dated: July 19th, 2010

SHOOK, HARDY & BACON L.L.P.
*Attorneys for Plaintiff*
1155 F Street, NW, Suite 200
Washington, D.C. 20004-1305
~~Miami Center, Suite 2400~~
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

BY_____
JENNIFER H. MCGEE
D.C. Bar No. 488704
jmcgee@shb.com
PETER E. STRAND
D.C. Bar No. 481870
pstrand@shb.com

Miami Center, Suite 2400
201 South Biscayne Boulevard
Miami, Florida 33131-4332
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

BY_____
EDWARD A. MOSS
Florida Bar No. 57016
emoss@shb.com

BY_____
MARK A. SCHWEIKERT
Florida Bar No. 0070555
mschweikert@shb.com

## **VERIFICATION**

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on July __8__, 2010.

_____
Dan Abraham Sarfati