UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAN ABRAHAM SARFATI,

    Plaintiff,

        v.

ANTIGUA AND BARBUDA, a foreign state, the MINISTRY OF FINANCE, a political subdivision of Antigua and Barbuda, and the MINISTRY OF AGRICULTURE, FISHERIES, LANDS, AND HOUSING, a political subdivision of Antigua and Barbuda,

    Defendants.

Civil Action No. 10-1221 (JEB)

## MEMORANDUM OPINION

The controversy that gives rise to this suit began in 1987 in the tiny twin-island nation of Antigua and Barbuda, located in the Eastern Caribbean. Roydan, Ltd., an Antiguan agricultural company, entered into an agreement that year with the country's Ministry of Agriculture to provide funding and equipment to rehabilitate up to 5,000 acres of fallow land in exchange for four promissory notes, each with a principal sum of $250,000. Plaintiff Dan Sarfati, assignee of Roydan's interest in three of these notes, brought this breach-of-contract action against the Antiguan government and two subdivisions in 2010, seeking payment on the notes, which came due more than twenty years before. Defendants now move to dismiss or for summary judgment, arguing, among other things, that Plaintiff's claims are barred by a six-year statute of limitations. Plaintiff contends that the delay here was justified and that Defendants' wrongdoing – threats and intimidation over the course of many years – equitably estops them from asserting a limitations defense. Because the Court finds that the conduct that allegedly impeded the

1

bringing of this action subsided more than six years before Plaintiff filed, he cannot invoke equitable estoppel or defeat this Motion.

**I.      Background**

Viewing the facts in the light most favorable to Plaintiff, the Court agrees that the story of this case begins in 1985, when Plaintiff's father, Maurice Sarfati, established Roydan, Ltd., "to develop a modern agricultural project of growing and exporting high-quality produce abroad." Pl.'s Statement of Material Facts (SMF), ¶¶ 5, 6. This first project was a success and led to a second: the rehabilitation of fallow sugar land owned by the Antiguan government. See id., ¶¶ 9, 10. Following multiple presentations to the Antiguan cabinet, Roydan entered into an agreement with the Ministry of Agriculture to provide technical, financial, and marketing expertise on the five-year, 5,000-acre agricultural project. See id., ¶¶ 12-13. The agreement included a provision whereby "[t]he Ministry of Finance and Agriculture jointly and separately will guarantee Roydan Ltd by way of letter of guarantee on behalf of the government, coupled with the instrument of promissory note." See id., ¶ 13 (quoting Exh. M (May 15, 1987, Agreement)). This Guarantee was signed on June 16, 1987, and authorized the Ministry of Agriculture to issue four separate promissory notes to Roydan. See id., ¶ 15. Three days later, these notes were issued, wherein the government of Antigua and Barbuda promised to pay Roydan $250,000 for each note, plus interest. See id., ¶ 16. The notes contained a provision that they "shall be governed and construed in accordance with the laws of the state of New York, U.S.A." Id., ¶ 17.

The notes came due on the following dates: Promissory Note No. 1 was due to be paid on June 2, 1990; Promissory Note No. 2 on June 10, 1990; and Promissory Note No. 4 on June 30, 1990. See Verified Compl., ¶ 34. Promissory Note No. 3 was sold to an investor at the end

of 1987 and is not at issue in this suit. See id., ¶ 38. On or about October 15, 1987, while still a young child, Plaintiff Dan Sarfati was assigned "all of [Roydan's] right, title, and interest" in the three promissory notes. See SMF, ¶ 16 n.8. Defendants' obligations under these notes, along with the Guarantee, are at issue in this suit.

Towards the end of 1987, after the notes had been issued, Plaintiff's father's relationships with various members of the Antiguan government began to deteriorate. See id., ¶ 23. Beginning in January 1988, Maurice Sarfati was subjected to threats from various individuals within the government. See id., ¶¶ 24-62. Maurice claims that during this time, the government, in connection with his creditors, "hatched an illicit scheme to run [him] out of Antigua and seize Roydan." Id., ¶¶ 27-33, 35, 37. Maurice was warned that if anyone sought payment on the notes, the government would "issue an international arrest warrant for that person, have them extradited to Antigua, and thrown in jail." Id., ¶ 39. The nature and extent of these threats are discussed in detail in Sections III(B)(a)-(c), *infra*. Intimidated by these threats to his father, Plaintiff, who reached the age of majority in 2000, took no action to seek payment on the Notes until 2005. See id., ¶ 58. At that point, he contacted an American attorney, William O'Connor, who sent letters to the Antiguan government requesting payment, but received no response. See id. On July 19, 2010 – more than 20 years after the notes had come due and nearly ten years after he had attained the age of majority – Plaintiff filed this suit seeking payment on the notes. See Verified Compl., ¶¶ 5, 34, 36.

Defendants now move to dismiss the Complaint or, in the alternative, for summary judgment, arguing that both the Foreign Sovereign Immunities Act and the applicable statute of limitations bar the suit. As Defendants prove correct on the latter argument, the Court need not address the former. Prior to the filing of Defendants' Motion, Plaintiff preemptively filed a

Motion for Summary Judgment on Defendants' First, Second, and Fourth Affirmative Defenses. See ECF No. 34. The Court will deny this Motion as moot, given its determination that Plaintiff's claims are barred by the statute of limitations. In addition, both sides have filed Motions to Strike certain affidavits or exhibits filed by their adversary. See ECF Nos. 42, 43. Because summary judgment for Defendants is appropriate even if Plaintiff's materials are considered and Defendants' are ignored, the Court will also deny both Motions to Strike as moot.

## II.     Legal Standard

Defendants' Motion seeks dismissal of Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6) as barred by the statute of limitations. See Mot. at 5-15. Plaintiff, however, argues that because Defendants cite to matters outside of the pleadings, the Court should convert that portion of Defendants' Motion to one for summary judgment. See Opp. at 6. Because both Defendants and Plaintiff have submitted, and the Court has considered, matters outside of the pleadings, the Court agrees with Plaintiff and will treat Defendants' Motion as one for summary judgment, as Rule 12(d) contemplates. See Yates v. Dist. of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003) (*per curiam*) (motion to dismiss under Rule 12(b)(6) converted to summary-judgment motion under Rule 56 where parties submitted and magistrate judge considered matters outside pleadings); see also Brown v. Dorsey & Whitney, 267 F. Supp. 2d 61, 68 (D.D.C. 2003) (court converted Rule 12(b)(6) motion to one for summary judgment where "the parties will not be prejudiced by the Court's consideration of matters outside the pleadings").

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." Holcomb, 433 F.3d at 895 (quoting Liberty Lobby, Inc., 477 U.S. at 248). "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." Taxpayers Watchdog, Inc., v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987). "Until the movant has met its burden, the opponent of a summary judgment motion is under no obligation to present any evidence." Gray v. Greyhound Lines, East, 545 F.2d 169, 174 (D.C. Cir. 1976).

When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*); Washington Post Co. v. U.S. Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham

v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  Liberty Lobby, Inc., 477 U.S. at 249-50.

### III. Analysis

Defendants contend that Plaintiff's Complaint – filed on July 19, 2010 – is barred by the statute of limitations, as it was filed beyond the six-year limit for breach-of-contract actions under New York law.  See Mot. at 5-15; Reply at 2-9.  Plaintiff maintains that Defendants should be equitably estopped from asserting this defense where their own misconduct prevented him from filing suit earlier.  See Opp. at 29-45.  Finding that Plaintiff cannot invoke this tolling doctrine after 2002, as the threats had by then subsided, the Court agrees with the defense.

### A. Statute of Limitations

Although Defendants make some reference to the District of Columbia's three-year statute of limitations for contract actions, see Mot. at 14-15, both parties appear to agree that New York's six-year statute governs Plaintiff's claims.  See Mot. at 6-14 (citing N.Y. CPLR Limitations of Time § 213 (2012) (cause of action based on contract has six-year statute of limitations); Opp. at 7.  This accords with the District's choice-of-law rules, given that the contract expressly states that New York law shall govern.  See Mobile Satellite Commc'ns, Inc. v. Intelsat USA Sales Corp., 646 F. Supp. 2d 124, 130 (D.D.C. 2009) (District law generally permits "'parties to a contract [to] specify the law they wish to govern'") (quoting Norris v. Norris, 419 A.2d 982, 984 (D.C. 1980)); SMF, ¶ 17.

Additionally, both parties appear to concur that because Plaintiff was a minor when the notes became due in 1990, the limitations period did not actually begin to run until he reached the age of majority in 2000.  See Mot. 7-8; Opp. at 30.  There is also no disagreement that the

6

suit was filed in 2010, which would, in normal circumstances, be four years too late.  Plaintiff maintains, however, that Defendants' egregious misconduct – including threats of extradition and arrest – prevented him from timely filing his suit.  See Opp. at 30-45.  The doctrine of equitable estoppel, he contends, therefore prevents Defendants from relying on the statute of limitations.  See id.  Defendants respond that Plaintiff has failed to show that equitable tolling is warranted, thus making any suit filed after 2006 untimely.  See Mot. at 8-14.

Because the statute of limitations is an affirmative defense, Defendants bear the burden of establishing a *prima facie* case that the limitations period has expired since Plaintiff's claims accrued.  See Hoosac Valley Farmers Exch., Inc. v. AG Assets, Inc., 563 N.Y.S. 2d 954, 955 (N.Y. App. Div. 1990).  This they have clearly managed since it is undisputed that the claims accrued in 2000 and suit was not filed until 2010.  The burden then shifts to Plaintiff to establish that the limitations period should be tolled.  See Waters of Saratoga Springs, Inc. v. State, 498 N.E. 2d 146, 146 (N.Y. 1986).

### B.  Tolling of Statute

In New York, tolling doctrines are to be construed "as narrowly as possible."  Overall v. Estate of L.H.P. Klotz, 52 F.3d 398, 403-06 (2d Cir. 1995) (citing McCarthy v. Volkswagen of Am., Inc., 435 N.E. 2d 1072, 1074  (N.Y. 1980) ("[T]olling provisions should not readily be given an expansive interpretation tending to undermine the basic purposes behind the Statutes of Limitation.")); see also Netzer v. Continuity Graphic Assocs., Inc., 963 F. Supp. 1308, 1318-19 (S.D.N.Y. 1997) ("'Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application.  They protect important social interests in certainty, accuracy, and repose . . . .  We should not trivialize the statute of

limitations by promiscuous application of tolling doctrines.'") (quoting Cada v. Baxter Healthcare Corp., 920 F.2d 446, 452–53 (7th Cir. 1990)).

        *1.*      *Equitable Estoppel*[1]

New York law provides that "'[a] defendant may be estopped from asserting the Statute of Limitations as a defense where he or she has wrongfully induced the plaintiff to refrain from timely commencing an action by deception, concealment, threats or other misconduct.'" Ross v. Louise Wise Servs., Inc., 777 N.Y.S. 2d 618, 621 (N.Y. App. Div. 2004) (quoting Zoe G. v. Frederick F.G., 617 N.Y.S. 2d 370 (N.Y. App. Div. 1994)); see also Zumpano v. Quinn, 849 N.E. 2d 926, 929 (N.Y. 2006) (quoting Gen. Stencils v. Chiappa, 219 N.E. 2d 169, 171 (N.Y. 1966)). This doctrine does not, however, open a limitless horizon for the filing of an action:

> Because a person who seeks equity must do equity, a plaintiff invoking estoppel must show that he brought his action "within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." [Simcuski v. Saeli, 377 N.E. 2d 713, 716 (N.Y. 1978)] Equitable estoppel, therefore, looks at the parties' conduct only to determine their relative blameworthiness in delaying the commencement of suit.

Overall, 52 F.3d at 404.

"[D]ue diligence on the part of the plaintiff in bringing [an] action is an essential element for the applicability of the doctrine of equitable estoppel . . . [and] the burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." Doe v. Holy See, 793 N.Y.S. 2d 565, 569 (N.Y. App. Div. 2005) (quotations omitted). This is a highly fact-specific inquiry wherein a court will determine when the conduct that impeded the filing of the action is no longer an obstacle to the

---

[1] Under New York law, the tolling doctrine of equitable estoppel is distinct from the tolling doctrine of duress. See Overall, 52 F.3d at 403-06 (providing lengthy distinction between two doctrines and recognizing that "their similarities often lead to confusion"). Plaintiff properly raises only equitable estoppel in his Opposition, since duress tolling requires that duress be "an element of the cause of action alleged," id. at 404 (citations omitted), which is not the case in a contract claim.

plaintiff's filing suit. See, e.g., Melendez v. Wilson, No. 04-73, 2006 WL 2621083, at *9 (S.D.N.Y. Sep. 12, 2006) (finding plaintiff's delay in filing unreasonable where he had "ample time remaining within the limitations period to file his action once the alleged threats, intimidation, and other conduct on behalf of prison officials ceased to be an impediment to his doing so. Instead, he waited over two years.").

The reach of this doctrine is further limited by the requirement that the defendant's misconduct be "egregious." See Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236, 250 (S.D.N.Y. 2000) (citing Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir.1995)); see also Dillon v. Conway, 642 F.3d 358, 363 (2d Cir. 2011) ("[a]s a general matter, [the Second Circuit has] set a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling"). In Arce v. Garcia, 434 F.3d 1254 (11th Cir. 2006), the Eleventh Circuit similarly recognized that "[s]tatutes of limitations serve important purposes in our legal system and should be strictly enforced in all but the most egregious of circumstances." Id. at 1265. While ultimately finding that the "the kind of 'extraordinary circumstances'" required to justify equitable tolling were present in that case, the court recognized concerns that "[a] lenient approach to equitable tolling would revive claims dating back decades, if not centuries, when most or all of the eye witnesses would no longer be alive to provide their accounts of the events in question." Id. (in context of civil war in El Salvador where military regime "would have used its significant power to thwart any efforts to redress the human rights violations that it perpetrated. . . . Potential witnesses would have been intimidated and perhaps tortured if they came forward. The plaintiffs legitimately feared that their family members and friends remaining in El Salvador would be subject to harsh reprisals and the same brutalities that the plaintiffs suffered."). Although not explicating New York law, the Eleventh Circuit's reasoning

9

seems consistent, and the Court must bear New York's high standard in mind when considering Plaintiff's tolling arguments.

    2. *Sufficiency of Facts Alleged*

On a motion for summary judgment, "'the burden is on the plaintiff to present facts which, if true, justify equitably estopping a defendant from asserting the statute of limitations.'" Netzer, 963 F. Supp. at 1316 (quoting Miller v. United States, 803 F. Supp. 1120, 1127 (E.D. Va. 1992). While the question of whether equitable estoppel applies is generally a question of fact, see Vigliotti v. North Shore Univ. Hosp., 810 N.Y.S. 2d 82, 85-86 (N.Y. App. Div. 2005), Plaintiff's sworn allegations here raise no material dispute as to whether he commenced the action within a reasonable time of the cessation of the threats directed at his family.

    a. Late 1980s: Threats Begin

Plaintiff begins his chronicle with a description of the Antiguan government, which, beginning in the 1980s, was "widely condemned for . . . its rampant corruption, its association with international drug cartels, and its financial delinquencies. See SMF, ¶¶ 3-4. During this time, the government was "dominated and controlled" by "Prime Minister Vere Bird, Sr., his two sons, Vere Bird, Jr. and Lester Bird, and their cohorts (the 'Bird Administration')." Id., ¶ 3. Plaintiff alleges that his father's relations with the Bird Administration "began to deteriorate" towards the end of 1987. See id., ¶ 23. In January 1988, Maurice received a visit from Jeff Harley, Lester Bird's personal assistant, whom Plaintiff describes as an "enforcer" for the Bird Administration. See id., ¶ 24. After informing Maurice that he was armed, Harley demanded a 25% stake in Roydan's agricultural project; when Maurice refused, Harley "menacingly" told him that if he did not comply, the government would seize Roydan's project. See id. Maurice subsequently told Lester Bird about this encounter, and Bird told him that "you better do what

you're told or else." Id. Later that month or early the following month, Maurice received a second visit from Harley, this time at the Sarfati home in Florida. See id., ¶ 25. During the visit, Harley threatened that he "could find [Maurice] anywhere," and that he "better call" Minister Vere Bird. Id. Maurice then called Bird and was informed that "you need to give [Harley] money or else you're gonna have some consequences." Id. Maurice, consequently, made a $3,500 cash payment to Harley. See id.

Following these initial threats, Maurice met with Vere Bird, Jr. and was told that "you better do what you're told, otherwise they're going to take the entire project away from you, and I cannot help you anymore." Id., ¶ 26. Plaintiff contends that Defendants then launched an "illicit scheme to run Maurice out of Antigua and seize Roydan." Id., ¶ 27. As part of this scheme, Maurice received a call from his bank, the Swiss American National Bank of Antigua (SANBA), demanding payment of Roydan's corporate debts. See id., ¶¶ 29-30. SANBA froze Roydan's corporate accounts, as well as Maurice's personal accounts, in an effort to "kill" Roydan's cash flow. See id. As a result of these efforts, the company was "effectively . . . forced into receivership" in March 1988. See id., ¶ 31. During this time, Maurice met with the Antiguan cabinet, as well as with representatives from SANBA and the Overseas Private Investment Corporation (OPIC) – a U.S. agency that had provided Roydan with two start-up loans totaling more than one million dollars – and was questioned about Roydan's financial capabilities. See id., ¶ 32. Within weeks, OPIC sued Plaintiff's father in the District Court for the District of Columbia for defaulting on Roydan's loans. See id., ¶ 33.

By November 1988, the threats against Maurice had escalated. After returning to Miami following a trip to Antigua, Maurice told Plaintiff – in a rather odd conversation to have with a six-year-old – that if he demanded payment on the notes, "he would be threatened with an

11

international arrest warrant and that he would be put in jail." Id., ¶ 49. Plaintiff describes growing up under an "immense fear" from these threats, and he was unable to "understand why the Antiguans would not just let up." Id., ¶ 50. At the end of 1988, Plaintiff's father fled Antigua for Miami. See id., ¶ 34. SANBA and the government had taken over Roydan, and it was announced at a staff meeting that Maurice was no longer permitted to enter the project and that police would be called to arrest him if he showed up. See id., ¶ 35. Maurice discussed his decision to flee Antigua as a result of the threats and concerns for his family's safety with Roydan's new farm manager, Moshe Peretz. Id., ¶¶ 36-38.

Without providing specific dates, Plaintiff alleges that these threats of arrest, extradition, and imprisonment were reiterated "repeatedly over the course of many years." Id., ¶¶ 39-40. Additionally, Harley again directed threats at Maurice – through a Roydan employee – that "[i]n case he returns to Antigua a policeman with bullets in the gun is waiting for him." Id., ¶ 40. "At the request of SANBA and the government, all of these threats were conveyed to Maurice over the course of many years." See id. Additionally, Maurice received warnings from his attorneys and Roydan's secretary that the Antiguan government was advising him not to seek payment on the notes, upon similar threats of retribution. See id., ¶ 41. Indeed, as the maturity date of the notes drew near, Hilroy Humphreys, the Minister of Agriculture, called Maurice at his home and threatened that he "better return" the notes or "not negotiate them, otherwise we'll issue a warrant and we'll arrest you." Id., ¶ 42.

    b.  1990s: Ongoing Threats

Fearing retaliation by the government, Maurice moved to Europe, and then Israel, remaining overseas until 1998. Id., ¶ 43. While abroad, he continued to receive menacing contacts from representatives in the Antiguan government, including Vere Bird, Jr., who

reiterated the threats about seeking payment on the notes, warning him that "you're being followed, we know where you are." Id., ¶ 44. At some point during this period, Plaintiff – approximately eight years old at the time – answered the phone and spoke with John Greaves, the General Manager of SANBA. See id., ¶ 45. No threats were directed at Plaintiff during this call, but he was told to have his father return Greave's call; when his father did so, he was again threatened that if he tried to reclaim Roydan, the government would throw him in jail. Id.

Defendants continued to contact Maurice while he was abroad: in 1996 and 1997, Bruce Rappaport, Antiguan Ambassador to Israel and Russia, and Moshe Peretz, Roydan's former farm manager, contacted Maurice in Israel and reiterated these threats. See id., ¶¶ 36, 46. Maurice believed that he was being followed in Israel and grew increasingly concerned about the safety and well-being of his family. See id., ¶ 47. While experiencing no direct threats during this period, Plaintiff recalls seeing a gun under his mother's pillow, which she explained was necessary "for us to protect ourselves against the Antiguans should they come." Id., ¶ 54. Throughout this time, Plaintiff's father warned him that the government was "relentless and would stop at nothing to prevent payment of the Promissory Notes." Id., ¶ 55. In January 2000, Maurice counter-sued SANBA and Ambassador Rappaport in Israel, though Plaintiff alleges that his father later dropped these claims due to his fear of the government. Id., ¶ 48.

### c.   2000s:  Threats Abate

Plaintiff makes no allegations of specific threats directed at his father or at anyone else in the family after 2000. See id., ¶¶ 54-62. In 2002, twelve years after the notes had come due, Maurice met with an attorney in Miami to discuss the outstanding notes. Id., ¶ 56. Plaintiff alleges that the attorney advised his father, who later shared the advice with Plaintiff, that it was too dangerous to seek payment because of threat of arrest or extradition. See id. Plaintiff

generally alleges – without providing any factual support – that "he became more fearful than ever to seek payment" on the notes in 2004. See id., ¶ 57. These generalized fears persisted, despite the absence of threats and Plaintiff's awareness that a new administration had come into power following the election of a new Prime Minister in 2004, who publicly condemned the prior administration's corruption. Id., ¶ 57. By 2005, 18 months into the new administration, and within the six-year window for filing his claims, Plaintiff "decided to cautiously approach the government" about the notes. See id., ¶ 58. "He hired an American attorney, William O'Connor, who sent letters to the government requesting payment." Id. No response was received from the government, and Plaintiff elected to take no further action. See id., ¶¶ 58-60.

While referencing "[t]he scare and the fear . . . compounded on all the family for 20 years," Plaintiff alleges no facts to support his failure to file suit between this episode in 2005 and 2010, as the threats directed at his father had subsided by 2002, and a new administration had been in place since 2004. See id., ¶ 58. Plaintiff attempts to explain that the new government's inaction on his letters "'illustrated to me that just because . . . one government replaces the other doesn't necessarily mean that they do not adopt the policies of the previous administration irrespective of the public announcements that they may make." Id., ¶ 60. Such a vague and illogical claim could justify waiting decades through a veritable procession of administrations before filing suit. Plaintiff also points to threats he claims his attorney experienced while serving as counsel on another case, see id., ¶ 59, but he offers no date, and the published decision in that case is 1989. Plaintiff does not allege, however, that these threats were in temporal proximity to the decision in 2005 not to file suit or were the sort of threat that could sufficiently justify his failure to file thereafter. See id. Plaintiff ultimately filed this suit in July 2010, having "had enough." See id., ¶ 62.

d.  Discussion

In determining whether Plaintiff may invoke the equitable-estoppel doctrine to overcome the defense of limitations, the Court must decide whether Plaintiff has provided evidence of misconduct by Defendants that is sufficiently prolonged and egregious to justify waiting until July 2010, two decades after the breach of the contracts and nearly a decade after Plaintiff reached the age of majority.  See, e.g., Evan S. v. Joseph R., 894 N.Y.S. 2d 91, 93 (N.Y. App. Div. 2010) (looking at timing and facts of alleged threats to determine that they "did not rise to the requisite level necessary to equitably estop the defendant from asserting the statute of limitations as a defense to this action brought by the plaintiff approximately five years after he reached the age of majority").

Plaintiff does not allege the commission of a single wrongful act by Defendants after 2000.  See SMF, ¶¶ 54-62.  While he attempts to prolong his period of fear for tolling purposes, the only references to threats or intimidation after he reached the age of majority are unsubstantiated and insufficient.  See id.  Examples of his claimed fear, unsupported by malfeasance by Defendants, include claims that

- Plaintiff "and his family remained terrified of taking any action concerning the Promissory Notes," after advice from an attorney in 2002 that it was "too dangerous to seek payment," see id., ¶ 56;

- In 2004 Plaintiff "became more fearful than ever to seek payment on the Promissory Notes" after reading statements by the new administration publicly condemning the previous administration, see id., ¶ 57;

- In 2005, "the scare and the fear was still there.  The scare and the fear was compounded on all the family for 20 years," see id., ¶ 58;

- Government "inaction" in failing to respond to his letters requesting payment on the notes "illustrated" to Plaintiff that the new administration could be merely a continuation of the previous administration, a fear that was "magnified by the United States Department of State's report that, despite the

> change in administrations, 'problems remained in a few areas . . . [including] high-level corruption.'" See id., ¶ 60 & n.15; and
>
> - "[W]e were in great fear. How could we, as normal citizens, challenge or disregard the threats of an international arrest warrant . . .[?] I was in fear that if I did try to enforce the notes, that I sure [*sic*], as someone who is a major, would be arrested or they would, in fact, exact the same threat and carry out the threat that they did my father . . . ."

See id., ¶ 61. Even if the first incident – *i.e.*, the 2002 advice from an attorney – might justify delay, albeit unoccasioned by Defendants' own acts, none of the others does. The fear is vaporous and insubstantial. Permitting these claims to stop the clock would eviscerate any reasonable understanding of statutes of limitations.

While the threats of arrest and extradition directed at Plaintiff's father during the late 1980s and into the 1990s may well have been sufficient to deter Plaintiff from filing suit then, even had he been of age, by the time he reached majority in 2000 – or at least from 2002 – no such threats can justify the years that passed before Plaintiff ultimately filed his Complaint. See, e.g., Murphy v. Merzbacher, 697 A.2d 861, 868 (Md. 1997) (plaintiff could not raise estoppel argument to bar defense of limitations where no evidence of threats or overt acts by defendant during three-year general limitations period that followed plaintiff's majority; "cessation of the defendant's conduct afford[ed] the plaintiff ample time thereafter in which to institute his or her action prior to the running of the statute of limitations").

The Court's conclusion is consistent with the holding in Jaso v. The Coca Cola Co., 435 F. App'x 346 (5th Cir. 2011). The Fifth Circuit there looked at both the timing and substance of the alleged threats, determining that the defendants' threats at gunpoint to stop lawsuits and the attempted kidnapping of the plaintiff's son were sufficiently egregious to prevent the plaintiff from asserting his rights. The court, however, went on to find that equitable tolling was not

available to the plaintiff where this conduct had ceased well in advance of the filing of his complaint:

> Proof of threats have been considered in tolling the statute of limitations only where "the threats themselves continue up to the point that the plaintiff brings her action." Baye v. Diocese of Rapid City, 630 F.3d 757, 762 (8th Cir. 2011); see also Rakes v. United States, 442 F.3d 7, 26 (1st Cir. 2006) (plaintiff must demonstrate that threats leading to duress were continuous before equitably tolling the statute of limitations); Overall, 52 F.3d at 404 (same).

Id. at 358; see also Zein v. United States, 52 Fed. Cl. 101, 104 (Fed. Cl. 2002) (after conducting inquiry into timing of threats, court ultimately dismissed case as untimely because plaintiff's explanation for filing so late was insufficient as a matter of law); Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1075 (2d Cir. 1993) (rejecting equitable tolling and affirming summary judgment for defendants where "aside from rather vague and general references to [] alleged misdeeds, [the appellant] has failed to advance any credible proof of wrongful actions on the part of this appellee or its insurance company").

Indeed, Plaintiff's own actions belie his claims that fear caused the delay here, as he sent a letter directly to the Antiguan government seeking payment on the notes in 2005 (within the six-year window for filing suit). See id., ¶¶ 58-60. His reasons for failing to follow up or to bring suit are insufficient as a matter of law. Plaintiff simply has not filed this action "within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." Overall, 52 F.3d at 404 (citation and internal quotation marks omitted).

"[D]ue diligence on the part of the plaintiff in bringing his action is an essential element for the applicability of the doctrine of equitable estoppel, to be demonstrated by the plaintiff when he seeks the shelter of the doctrine." Simcuski, 377 N.E. 2d at 717. Where, as here, Plaintiff fails to demonstrate that he filed suit within a reasonable time after the threats had

17

subsided, he cannot invoke the doctrine. The Court, furthermore, finds the record sufficiently developed such that additional supplementation would not aid it in determining whether tolling should apply here. Cf. id., 377 N.E. 2d at 717 (finding it premature to determine whether action was timely, given "skeletal record" before court).

### IV.  Conclusion

For the foregoing reasons, the Court will grant judgment in favor of Defendants. A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 7, 2013